**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| MICHAEL LAZAREV,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>HOLLIE KENNIFF,<br><br>　　　　　　　Defendant. | Case No.: |

**COMPLAINT WITH JURY DEMAND**

NOW COMES Plaintiff Michael Lazarev (herein "Plaintiff"), by and through the undersigned counsel, and complains against Defendant Hollie Kenniff (herein "Defendant") as follows:

**PARTIES, VENUE, AND JURISDICTION**

1. Plaintiff is an individual who, at all times relevant, has maintained dual citizenship in the United States and the United Kingdom and a permanent residence in the United Kingdom.

2. Defendant is an individual who, at all times relevant, has maintained a residence in the County of Cumberland, town of Yarmouth, State of Maine.

3. Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b)(1) as Defendant resides in the district where this Court is located.

4. This Court has original jurisdiction over Defendant pursuant to 28 U.S.C.A. § 1332(a)(2) as the amount in controversy exceeds $75,000 and this action is between a citizen of a State and a citizen of a foreign state.

## FACTUAL ALLEGATIONS

5. Plaintiff is a renowned London-based composer of cinematic, ambient, modern classical, and solo piano music. Plaintiff composes his own music and works with other musicians, from time to time, on various collaborations. Plaintiff is also an online journalist who started a blog in 2007 which evolved into an online magazine titled, Headphone Commute.

6. Plaintiff, in his capacity as an online journalist, met Defendant and her husband in 2007 when he covered their music on Headphone Commute. Plaintiff would, from time to time after 2007, cover Defendant and/or her husband's music on Headphone Commute. In March 2022, Plaintiff began working on a music compilation collaboration (herein "Collaboration") with Defendant. This Collaboration consisted of three volumes – volume one curated by Defendant was released on March 18, 2022; volume two curated by Defendant was released on April 29, 2022; and volume three curated by Rafael Anton Irisarri (herein "Rafael") was released on September 2, 2022. The Collaboration remained online and available for purchase for the duration of one year.

7. Prior to and during the course of the Collaboration, Plaintiff and Defendant maintained a professional relationship through Headphone Commute.

### Defendant's Obsession

8. During the course of the Collaboration and after it ended, Defendant began to exhibit obsessive like tendencies toward Plaintiff. These tendencies consisted of Defendant persistently contacting Plaintiff through various forms of communication.

9. At first, these communications, while unsolicited, were seemingly innocent. However, over time, these communications escalated and became harassing. Defendant, through oversharing her own experiences, seemingly sought intimate information about Plaintiff's

marriage and past sexual relationships. These communications were unwelcomed, and Plaintiff told Defendant to stop on numerous occasions.

10. Eventually, on March 31, 2023, after the unwelcomed communications continued, Plaintiff, in a very clear and direct manner, told Defendant to stop contacting him. A true and accurate copy of this communication is attached as **Exhibit A** and states as follows:

> "Please read this carefully and internalize every single word. I am being as clear and direct as possible. As I told you many times in the past, your attention is unwanted. I have absolutely no interest in engaging with you on any level. As of this moment, any personal and professional relationship that we've had is over. Do not contact me again via any means. Do not engage in any activity that may defame my character. All further contact from you or Keith will be interpreted as harassment, and I will be forced to pursue appropriate legal action. This is very serious and very real. It is non-negotiable. This email will be the very last time you will ever hear from me."

11. Defendant, however, did not abide by Plaintiff's wishes. Instead, Defendant sent 242 emails to Plaintiff between March 31, 2023 and November 10, 2023. These emails were disturbing and caused both Plaintiff and his wife to sustain extreme emotional distress. One such communication that Defendant sent to Plaintiff's wife included 16 attachments and claimed that Defendant had hired a private investigator. One attachment was a photograph of Plaintiff's wife in their residence. This photograph was taken by someone who was following her. Another attachment included communications Plaintiff allegedly sent to Defendant. Plaintiff, however, never sent any of the communications that were contained in the attachment.

### Defendant's Harassment Campaign

12. Plaintiff, as stated in his March 31, 2023 email, continued to ignore Defendant despite her constant communications. Upon information and belief, Defendant became aggravated that Plaintiff would not engage with her and became fearful that Plaintiff would tell others about the erratic and obsessive love infatuation that she had developed towards him. As a result, Defendant concocted a plan. This plan consisted of telling other people, including Plaintiff's

#18416843v2

friends, business partners, and prominent individuals in Plaintiff's professional music community, that she is scared for her safety, that Defendant is bipolar, suicidal, has a violence fetish, and is struggling with obsessive love thoughts towards her. True and accurate copies of these communications are attached as **Exhibits B-F**.

13. Defendant, as part of her plan, also attempted to interfere with Plaintiff's music labels. On June 30, 2024, Defendant sent Rafael an email which stated, "[y]esterday I spoke with someone who has power in the ambient community and I shared about what Mike has done to me, and he said that he has my back and wants to publicly expose him and remove him from his label." *See* Exhibit E. The email continued to state, "[h]e know[s] Mike and was furious, and urged me to speak out publicly. I sent him a lengthy document describing what Mike has done." *Id*.

14. To be clear, Plaintiff is not bipolar and has never been diagnosed with bipolar disorder. Further, as exhibited through his March 31, 2023 email, Plaintiff is in no way experiencing obsessive love thoughts towards Defendant. Plaintiff clearly communicated that he was uninterested in Defendant and told her to stop contacting him. Accordingly, Plaintiff has not responded to any of Defendant's numerous emails.

15. Plaintiff has in no way "done" anything to Defendant, aside from telling her to stop harassing him. *See* Exhibit A. Any lengthy document that Defendant may have sent "describing what [Plaintiff] has done" is a complete fabrication.

16. Additionally, Plaintiff is not suicidal. Defendant made the unsupported assertion in numerous emails that Plaintiff is suicidal because he has been playing a mixture of heavy metal and romance music on this last.fm account. *See* Exhibit F. Defendant further made the nonsensical argument that Plaintiff is "manically directing music at me, hoping to convince me of his 'infinite

4

#18416843v2

true love' and at the same time scare me with angry metal songs because I haven't agreed to run away with him." *Id*.

17. Last.fm is a social media music platform. Last.fm tracks and shares a user's music listening habits so that other users can see these listening habits. Further, the platform allows users to discover new music by suggesting artists and songs that another user might like.

18. Defendant, further evidencing her obsession with Plaintiff, has been avidly tracking Plaintiff's last.fm account and has been keeping note of every song he plays. Disturbingly, Defendant, for some unknown reason, decided that Plaintiff's song choices were selected to send her the hidden message that he is in love with her.

19. On September 7, 2023, Defendant contacted Rafael and stated, "I have discovered [Plaintiff] has at least five last.fm accounts[1] and all but the Headphone Commute one are actively playing songs directed at me." *Id*.

20. Rafael, clearly confused by the statement, asked Defendant if any of the last.fm accounts had contacted her, sent her any messages, or contacted her in any way. *Id*. Defendant then responded, "[t]hese last.fm accounts have not contacted me, which makes it very smart on his part, in terms of committing a future crime of passion." *Id*.

21. Plaintiff, however, had disabled his last.fm account after he sent Defendant the email on March 31, 2023, which asked her to stop contacting him. Upon information and belief, Defendant has found other people's last.fm accounts, which she claims belong to Plaintiff, and has begun tracking their playlists. To this day, Defendant continues to spew the ridiculous notion that Plaintiff is playing music at her through last.fm.

---

[1] Plaintiff only has one last.fm account. Defendant incorrectly asserts to Rafael that Plaintiff has "at least five last.fm accounts." *See* Exhibit F.

22.     Defendant's assertion that Plaintiff is directing music at her to convince her of his love is outlandish.  Plaintiff clearly told Defendant that he wanted nothing to do with her.  Defendant obviously cannot cope with the fact that her advances towards Plaintiff were rejected and has since resorted to enacting her plan in an attempt to make Plaintiff appear dangerous, manipulative, and obsessive.

### Defendant's Short-Lived Contractual Promise

23.     After Defendant sent communications to Plaintiff's wife, Plaintiff decided to contact a London-based attorney.  On October 1, 2024, Plaintiff's London-based attorney sent Defendant a demand to cease contact with Plaintiff.  A true and accurate copy of this demand is attached as **Exhibit G**.  Defendant agreed to comply with the demand and stated, "I will agree to the contractual promise and not contact [Plaintiff] or [his wife] or any party I know to be associated with [Plaintiff] by any means whatsoever or to encourage any other person to engage in any other activity that is likely to cause [Plaintiff] alarm or distress."  A true and accurate copy of the correspondence is attached as **Exhibit H**.  Defendant's London-based attorney then sent Defendant a letter on October 3, 2024, which memorialized this contractual agreement.  A true and accurate copy of the letter is attached as **Exhibit I**.

24.     However, this contractual agreement was short-lived.  Between January 6, 2025 and January 15, 2025, Defendant, in an attempt to contact Plaintiff and in direct violation of the contractual agreement, sent Plaintiff's attorney 18 emails which were addressed to Plaintiff.  Curiously the emails, even though they were addressed to Plaintiff, stated that Defendant did not want the correspondence to be shared with Plaintiff and pleaded that she did not want her home address to be shared with Plaintiff because she allegedly feared for her life.  Additionally,

Defendant, pursuant to the memorization of the contractual agreement, fully knew that all correspondence she sent to Plaintiff's attorney would be disclosed to Plaintiff. *See* Exhibit I.

25. Plaintiff's London-based attorney sent Defendant a letter as a result of Defendant's breach of the contractual agreement. A true and accurate copy of this letter is attached as **Exhibit J**.

26. Defendant, however, did not stop there. In addition to inundating Plaintiff's attorney with emails, Defendant also sent correspondence to at least two musicians in Plaintiff's professional community.

27. On May 27, 2025, Plaintiff received a text message from Rafael which stated, "if you are in London and see this, call me right away from a private place. It's super important." A true and accurate copy of this text message is attached as **Exhibit K**.

28. Plaintiff was alarmed when he received this text message and immediately knew the message was prompted by Defendant's influence. Unsettled by Defendant's prior relentless conduct, Plaintiff decided to search social media for clues as to what could have prompted this text message from Rafael. Much to Plaintiff's dismay he saw that Defendant posted on Instagram that she was in London. A true and accurate capture of the Instagram post is attached as **Exhibit L**. Upon information and belief, Defendant specifically chose to stay at the Savoy hotel in London because she knew Plaintiff lived across the street from the hotel.

29. Clearly, Defendant, in opposition to what she had been telling others, did not actually think Plaintiff posed a risk to her life otherwise she would have not traveled to London and stayed at a hotel across the street from Plaintiff's residence.

30. Rafael informed Plaintiff, when they spoke on the phone, that Defendant had contacted him numerous times. Rafael also stated, "the entire community is behind you." Plaintiff

was immediately distraught as this meant Defendant had been making false statements about him to a large audience.

31. On May 21, 2025, Plaintiff spoke with James Murray (herein "James"), another owner of a music label, Slowcraft, that signed Plaintiff. During this exchange, James informed Plaintiff that he had received a lengthy email from Defendant. James later forwarded Plaintiff the email.

32. In the email, Defendant referred to an individual as "X." However, the identity of X was clear as the email made specific references to Plaintiff's music. Surely, Plaintiff's music label would know the true identity of X was actually Plaintiff. In the email, Defendant stated the following false allegations:

> a. Plaintiff treated her in a "misogynistic and frightening manner" and that Plaintiff spread "misleading gossip" about her which made her fear he had damaged her career. *See* Exhibit B.
>
> b. Defendant and her husband hired a private investigator after a "particularly irrational and threatening incident" and that they are concerned for her safety. *Id*.
>
> c. Plaintiff may have hacked into her email. *Id*.
>
> d. Plaintiff is suicidal, struggles with anxiety, and could potentially be the individual who sent her anonymous threatening emails and love letters. *Id*.

33. Clearly intent on interfering with Plaintiff's music labels, Defendant also reached out to the owner of Plaintiff's other music label, Past Inside the Present. The owner of the music label informed Plaintiff about Defendant's correspondence. He stated, "[n]ot only have I received unsolicited emails, they came in a barrage of many many emails. Not only me, but also someone else in my PITP squad. Both of us requested multiple times not to email us anything anymore."

34. Defendant additionally resumed sending lengthy emails to Plaintiff. These emails are daily and Defendant often sends more than one email a day. The emails seem to be a diary of

Defendant's day and are often nonsensical professions about her love obsession with Plaintiff. On June 7, 2025 at 7:46pm Defendant wrote:

a. "Also...you're hot too. A bit more to be honest." A true and accurate copy of the email is attached as **Exhibit M**.

b. "So if anyone sends you a malicious message full of lies too, falsely claiming I'm saying you're a stalker or a rapist, just know: I think you're hot too. haha. That business-professional-with-glasses and secret goth vibe works for you. But it's not a sexual obsession that inspired me to write to you or try to repair things between us. I'm a believer in in-person chemistry, so I can't even say whether I'd find you hot or not in real life." *Id*.

c. "It's quite a strange situation I've found myself in, where I have to tell two old friends, "Hey, you guys are hot" just to prove I'd never call Raf a rapist or you a serial stalker. Should I have dialed it down and just said "objectively good-looking humans"? :D I just need to get my point across that I'd never, in a million years, call Raf a rapist." *Id*.

d. "I'm not embarrassed for having cared about you. And when I received anonymous messages, which I'm not claiming here were from you, the absolute *only* reason I engaged with them is that I absolutely did think they were from you, and there is a clear paper trail of this." *Id*.

e. "It's exactly like the plot of a complicated film, and can you imagine what it felt like last week for me to discover you were a two minute walk away from my hotel? I cried for a few minutes, at one point, and asked Keith why the universe would do this to me, and he replied that he thought it could be a healing opportunity." *Id*.

f. "Before you think I'm stupid, please understand, the man in Manchester, who claimed to be you, is highly intelligent, appears to speak multiple languages, and knows practically everything about films and music. He outsmarted me because he wanted my attention and affection." *Id*.

g. "I absolutely didn't tell anyone you asked me to go to a sex dungeon in London, fyi." *Id*.

h. "Mike there is a man who impersonated you, because he said that he thought it was the only way I might care about him. I received a lot of anonymous messages and there is one moniker which sent the most detailed apology, which this man never admitted to being behind, and which Keith doesn't think is this man, so who was it? Who was it that said he was sorry for ghosting me, etc? Was it him, was it you, was it someone else?" *Id*.

      i. "Also, if I was stalking, I would've created an account to friend you on TikTok and your Patreon initiative. **I don't go where I'm not wanted. Except like near your home last week. lol.** 😁 Well, it's not my fault you bought a home near my hotel." *Id*.

35. Defendant has continued to send Plaintiff lengthy rambling emails, similar to the June 7, 2025 email, which demonstrates her erratic and obsessive love infatuation toward Plaintiff. Plaintiff has not responded to any of the emails.

## Damage to Plaintiff

36. As a direct and proximate result of Defendant's continued and unwanted emails, Plaintiff has sustained extreme mental anguish and emotional distress. Plaintiff has consistently experienced anxiety, depression, and other intrusive thoughts as a result of Defendant's conduct towards Plaintiff, his family, and his professional contacts. Plaintiff's daily life has been constantly disrupted as a result of Defendant's conduct. Plaintiff lives in a constant state of fear and paranoia that Defendant will continue her attacks at any moment.

37. As a direct result of Defendant's continued and unwanted emails, Plaintiff has additionally been forced to expend a significant amount of time and cost trying to mitigate the damage Defendant has caused through her plan which consists of making false statements that Plaintiff is violent, bipolar, suicidal, and struggling with obsessive love thoughts towards her.

38. Upon information and belief, Defendant concocted the plan as retribution because Plaintiff rejected her advances.

39. Upon information and belief, Defendant enacted this plan with reckless disregard as to the truth or falsity of her allegations and statements, as well as full knowledge that the accusations made against Plaintiff are completely false and fabricated.

#18416843v2

40. Upon information and belief, Defendant initiated the plan with the specific, malicious intent to damage Plaintiff's reputation, cause Plaintiff severe emotional distress and mental anguish, and place Plaintiff's career in jeopardy.

## COUNT ONE

### *Intentional Infliction of Emotional Distress*

41. Plaintiff incorporates the allegations and averments, and all subparts thereto, of paragraphs 1-40 as if fully restated herein.

42. Defendant enacted a plan against Plaintiff which consisted of contacting numerous individuals in Plaintiff's personal and professional communities in order to falsely inform them that Plaintiff is bipolar, suicidal, misogynistic, struggling with obsessive love thoughts towards her, and trying to contact her by playing love songs and heavy metal music on his last.fm account. Exhibits B-F.

43. Defendant also told others that Plaintiff engaged in some kind of threatening and irrational incident towards her. Exhibit B. Specifically, Defendant inundated Plaintiff with numerous lengthy emails despite his request for Defendant to stop.

44. Defendant also contacted Plaintiff's wife in order to put a strain on his marriage. Defendant even flew to London and publicly announced on Instagram that she was staying at the Savoy hotel, conveniently located near Plaintiff's residence. Exhibit L.

45. Defendant knew or should have known that this conduct would result in serious emotional distress to Plaintiff.

46. On March 31, 2023, Plaintiff, in a clear manner, asked Defendant to stop contacting him. However, against Plaintiff's wishes, Defendant continued to contact Plaintiff and numerous

#18416843v2

individuals in his personal and professional community. Defendant's outreach to Plaintiff and members of his community is ongoing and persistent.

47. Upon information and belief, Defendant enacted this plan because she wanted retribution against Plaintiff because he denied her advances. Defendant intentionally wanted to inflict severe emotional distress on Plaintiff so that he could feel the same pain she felt when he rejected her.

48. Defendant's conduct is so extreme and outrageous that it goes beyond all possible bounds of decency and can be considered as atrocious and utterly intolerable in a civilized society.

49. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious emotional distress which is of such a nature that no reasonable person should be expected to endure. This emotional distress has caused Plaintiff to suffer anxiety, inability to conduct daily living activities, inability to fully perform his job, humiliation, and embarrassment.

50. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered non-economic and economic losses in excess of $75,000, with the exact amount to be proven at trial.

## COUNT TWO

### *Defamation*

51. Plaintiff incorporates the allegations and averments, and all subparts thereto, of paragraphs 1-50 as if fully restated herein.

52. Defendant, through enacting her plan, published numerous false and defamatory statements which alleged that Plaintiff treated her in a "misogynistic and frightening manner," that Plaintiff subjected her to a "particularly irrational and threatening incident," that Plaintiff has "traumatized [her] and made [her] deeply afraid," that Plaintiff "acted in a sadistic manner and is gleefully getting away with it," that Plaintiff sent her "menacing/threatening messages," that

Plaintiff has "acted in an extremely abusive way towards [her] and has caused [her] intense stress, sadness and fear," and that Plaintiff is suicidal and struggles with anxiety (herein "False Statements"). *See* Exhibits B and E.

53. Defendant sent these False Statements, via email, to individuals in Plaintiff's personal and professional community, including the owners of Plaintiff's various record labels.

54. These False Statements are patently false. Plaintiff has not had any contact with Defendant since March 31, 2023 and did not treat Defendant in a misogynistic and frightening manner and has in no way subjected Defendant to any kind of irrational and threatening incident. Further, Plaintiff is not suicidal and, prior to Defendant's persistent and unwanted conduct, did not suffer from anxiety.

55. Plaintiff has not conducted himself in any manner that could cause Defendant to feel afraid or traumatized. Plaintiff never sent Defendant any threatening messages nor acted in an abusive or sadistic manner. In fact, Defendant is the individual who has acted irrationally and in a frightening manner and has subjected Plaintiff to threats and a valid fear for his safety and that of his wife.

56. The False Statements are defamatory as they are false and accuse Plaintiff of morally and potentially criminal behavior. Further, the False Statements are of such a nature that they have the tendency to subject Plaintiff to ridicule or contempt and could jeopardize his career.

57. Defendant authored and published the False Statements to Plaintiff's professional and personal community without express or implied privilege or consent from Plaintiff.

58. In authoring and publishing these False Statements, Defendant acted with express or implied malice or with reckless disregard of the truth or falsity of these False Statements.

#18416843v2

59. As a direct and proximate result of the publication of the False Statements, Plaintiff has sustained, and will continue to sustain, immediate and irreparable harm and injury including, but not limited to, significant reputational harm affecting Plaintiff's business and profession, and mental anguish.

60. Plaintiff has additionally sustained non-economic and economic damages including, but not limited to, mitigation and other expenses related to pursuing the contractual agreement with Defendant in October 2024 and the filing of this lawsuit. Plaintiff has additionally suffered severe mental distress and loss of intangible assets in an amount exceeding $75,000 with the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and that this Court award the following relief to Plaintiff:

1. On all Counts compensatory damages in excess of $75,000, punitive damages, costs, and pre- and post-judgment interest;

2. An Order from this Court finding that Defendant intentionally inflicted emotional distress on Plaintiff;

3. An Order from this Court finding the False Statements to be false and defamatory;

4. Permanent injunctive relief, both mandatory and prohibitory that Defendant is prohibited from contacting Plaintiff or anyone in Plaintiff's personal or professional community and that Plaintiff is prohibited from making any statements concerning Plaintiff which directly or indirectly reference him; and

5. All other relief, both at law and in equity, this Court is empowered to grant.

## JURY DEMAND

Plaintiff hereby respectfully demands a trial by jury on all issues so triable.

Dated:  August 25, 2025

                          <u>/s/ *Sara A. Murphy*</u>
                          Sara A. Murphy
                          Pierce Atwood LLP
                          Merrill's Wharf
                          254 Commercial Street
                          Portland, Maine 04101
                          207-791-1100
                          smurphy@pierceatwood.com

                          *Attorney for Plaintiff Michael Lazarev*